**E-FILED**
Monday, 27 August, 2007  02:15:59 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES  DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

| | |
|---|---|
| JENNIFER STEWART,                    ) | |
|              **Plaintiff,**     ) | |
|    v.                                 ) | |
|                             ) | **Case No. 06-2074** |
| MICHAEL J. ASTRUE,                  ) | |
| COMMISSIONER OF SOCIAL          ) | |
| SECURITY,[1]                              ) | |
|              **Defendant.**   ) | |

# ORDER

In November 2005, Administrative Law Judge James Gildea (hereinafter "ALJ") denied Plaintiff Jennifer Stewart's application for supplemental security income (hereinafter "SSI") and disability insurance benefits (hereinafter "DIB").  The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act based on Plaintiff's capacity to perform a significant number of jobs in the national economy.  The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge.

In April 2006, Plaintiff filed a Complaint (#1) against Defendant Michael Astrue, the Commissioner of Social Security, seeking judicial review of the final decision by the Regional Commissioner of the Social Security Administration (hereinafter "SSA") denying SSI and DIB. In February 2007, Plaintiff filed a Motion for Summary Judgment (#10) and in March 2007, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#12). After reviewing the record and the memoranda presented by the parties, this Court **GRANTS** Plaintiff's Motion for Summary Judgment **(#10)**.

---

[1]Michael Astrue became Commissioner of the Social Security Administration on February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he was substituted for Jo Anne Barnhart as Defendant in this suit.

# I.  Background
## A.  Procedural Background

In February 2003, Plaintiff filed an application for SSI and DIB dating back to November 9, 2002.  (R. 75.)  The Commissioner denied this claim in April 2003 and upon reconsideration in July 2003.  (R. 35-37.)  Plaintiff appealed this decision and asked for a hearing.  The ALJ held a hearing in September 2005, and denied Plaintiff's claim in November 2005, finding her to be not disabled within the meaning of the Social Security Act.  (R. 16.)

In the November 2005 decision denying Plaintiff benefits, the ALJ made the following findings:  (1) the claimant met the disability insured status requirements of the Social Security Act on November 9, 2002, and continues to meet the requirements through the date of the ALJ's decision; (2) the claimant has not engaged in substantial gainful activity since the alleged onset of disability; (3) the claimant has a combination of impairments considered severe, but has not demonstrated that they meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (4) the claimant's alleged limitations were not fully credible; (5) the claimant had the residual functional capacity to perform the physical exertional and nonexertional requirements of work except that she is limited to lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, and is limited to performing work that does not require more than simple, routine tasks or constant interaction with coworkers or the general public; (6) the claimant is unable to return to her past relevant work as a waitress, nursery school attendant, data entry clerk, payroll clerk, and food service manager; (7) the claimant can perform a significant number of jobs in the national economy, including that of a laundry worker, sorter, and punch board assembler; and (8) the claimant was not under a "disability," as defined in the Social Security Act, at any time relevant to the decision.  (R. 24-25.)

In March 2006, the Appeals Council affirmed the ALJ's decision, making it the final administrative decision.  (R. 6-9.)  In April 2006, Plaintiff filed a Complaint (#1) seeking review of the final administrative decision.  In February 2007, Plaintiff filed a Motion for Summary

Judgment (#10), and in March 2007, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#12).

## B.  Factual Background

Plaintiff was born on October 23, 1955, and was forty-seven years old when she applied for benefits.  (R. 75.)  She has completed her GED and attended college for one year.  (R. 103, 337.)  She has previously worked as a data entry clerk, waitress, restaurant manager, payroll clerk, and babysitter.  (R. 98.)

Plaintiff and Defendant present the following evidence in support of their respective motions.  In July 2000, Plaintiff sought treatment from Lisa Watts, MSW, at the Human Service Center of White Oaks Companies of Illinois (hereinafter "White Oaks") after she was hospitalized for an attempted suicide by taking too many Xanax.  (R. 180.)  During the interview, Plaintiff disclosed that she had previously attempted to commit suicide in 1999 by overdosing on aspirin.  (R. 181.)  Plaintiff was diagnosed as having Bipolar I Disorder.  (R. 183.)

In her application for disability insurance benefits, Plaintiff alleges that she became disabled on November 9, 2002, due to her bipolar disorder, obsessive compulsive disorder (hereinafter "OCD"), and fibromyalgia.  (R. 75, 97.)  In October 2002, Dr. James Barnett examined Plaintiff after she complained about fatigue and depression.  (R. 226.)  Dr. Barnett gave Plaintiff some Zoloft samples and recommended she get a "good night's rest."  (R. 226.)  In November 2002, Dr. Barnett found Plaintiff to have "[b]ipolar disease with probable worsening of the depression aspect" and increased her Depakote dosage.  (R. 223.)

In December 2002, Plaintiff was treated at White Oaks for her Bipolar I Disorder and OCD.  (R. 177.)  Plaintiff said she was unable to leave her house during her depressed bipolar stages and due to OCD issues.  (R. 177.)  Plaintiff further stated she was only able to leave her house during her manic bipolar stages.  (R. 177.)

3

Also in December 2002, Dr. Barnett found Plaintiff to be in the midst of a "manic episode" and increased her dosage of Depakote while reducing her usage of Zoloft. (R. 221.) In January 2003, Dr. Barnett opined that Plaintiff's symptoms rendered her "unable to work." (R. 220.) In February 2003, Dr. Barnett diagnosed Plaintiff with fibromyalgia. (R. 215.) Dr. Barnett also stated in an April 2003 letter that Plaintiff was not "able to sustain concentration or social interaction necessary for work related activities." (R. 210.)

In February 2003, Dr. Narayana Reddy conducted a psychiatric evaluation, with the diagnostic impression that Plaintiff suffered from Bipolar I, Anxiety Disorder with Agoraphobia, Polysubstance Abuse, OCD, Major Depression, Personality Disorder Features, and Fibromyalgia. (R. 175-76.) Plaintiff stated that she had been unable to work since November 2002 due to anxiety. (R. 175.) Dr. Reddy opined that Plaintiff should discontinue taking Wellbutrin, which may have been contributing to her anxiety, and that she begin taking Paxil to help with her anxiety. (R. 176.) Dr. Reddy also signed a Psychiatric Report form in June 2003 stating that he saw Plaintiff once weekly from December 2002 until June 2003. (R. 235.)

In March 2003, psychologist Dr. Marvin Turl examined Plaintiff. (R. 185-89.) Plaintiff reported her daily activities included caring for her four dogs, making coffee, watching a young girl who is the daughter of a friend, using her computer to check emails, watching movies, cooking meals, talking on the phone, and doing laundry and housework. (R. 187.) Plaintiff reported that she experiences confusion or memory impairment. (R. 188.) Dr. Turl opined that Plaintiff was "fairly chronically depressed" but doubted that Plaintiff was agoraphobic because "she is able to leave her house for those things which are in her best interests, or which she wants to do." (R. 187-88.) Dr. Turl attributed Plaintiff's anxiety and depression to her Post Traumatic Stress Disorder ("PTSD"). (R. 188.) In addition to PTSD, Dr. Turl opined that Plaintiff suffers from Generalized Anxiety Disorder and Major Depression. (R. 189.)

State agency psychologists completed two sets of Psychiatric Review Technique forms and Mental Residual Functional Capacity Assessment forms in March and July 2003. (R. 190-207, 239-56.) In the March 2003 forms, Dr. Patricia Beers opined that Plaintiff had

4

Major Depression and Anxiety Disorder with Post Traumatic Stress symptoms and Agoraphobic signs.  (R. 193, 195, 206.)  Dr. Beers reported that Plaintiff has moderate restriction of activities of daily living and moderate difficulties in maintaining social functioning, and she was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to travel in unfamiliar places or use public transportation.  (R. 200, 204-05.)  Dr. Beers finally opined that Plaintiff's "cognitive abilities are intact and she is able to understand, recall, and execute most instructions."  (R. 206.)

In the July 2003 forms, Dr. Phyllis Brister stated that Plaintiff had Depression, Anxiety Disorder, and PTSD.  (R. 242, 244.)  Dr. Brister reported that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, and she was moderately limited in her ability to carry out detailed instructions, the ability to work in coordination with or proximity to others without being distracted by them, the ability to interact appropriately with the general public, and the ability to accept instructions and respond appropriately to criticism from supervisors. (R. 249, 253-54.)

In July 2003, after Plaintiff moved to Decatur, she changed health care providers from Human Service Center in Peoria to Heritage Behavioral Health Center.  At Heritage Behavioral Health Center, Dr. Michele Hines, a psychiatrist, evaluated Plaintiff and stated that Plaintiff had negative feelings toward Dr. Reddy at the Human Service Center and felt "he did not spend enough time with her and was not interested in her enough."  (R. 305.)  Dr. Hines also noted that Plaintiff had attempted suicide in 2000, but "has no other history of suicide attempts."  (R. 305.)  This contradicts Plaintiff's report to Lisa Watts in July 2000 when she said she had previously attempted to commit suicide in 1999.  (R. 181.)  Dr. Hines diagnosed Plaintiff as having bipolar disorder, panic disorder with agoraphobia, and personality disorder with borderline features.

(R. 306.)  Plaintiff consulted Dr. Hines again in September 2003, reporting that she was "in a manic phase" and agoraphobic.  (R. 298.)  At this visit, Plaintiff denied any problems or side effects related to her medication.  (R. 298.)

In October 2003, Plaintiff saw Dr. Kripakaran Puvalai for the first time.  (R. 296.) Dr. Puvalai found that Plaintiff had Bipolar I disorder and panic disorder with agoraphobia. (R. 296.)  Dr. Puvalai increased Plaintiff's dosage of Depakote, started Plaintiff on Zoloft, and discontinued the usage of Effexor.  (R. 296.)  In January 2004, Plaintiff "stated she was doing fine" and "[d]enied manic or depressive symptoms."  (R. 294.)  Dr. Puvalai diagnosed Plaintiff with bipolar I disorder and panic disorder *without* agoraphobia.  (R. 294.)  In April 2004, Plaintiff reported that she had high levels of anxiety and was planning to attend her daughter's graduation in Washington, D.C.  (R. 292.)  Dr. Puvalai recommended Plaintiff take Vistaril to cope with her anxiety.  (R. 292.)  At an appointment in July 2004, Dr. Puvalai diagnosed Plaintiff with bipolar I disorder, generalized anxiety disorder, and panic disorder *with* agoraphobia.  (R. 290.)  During this visit, Plaintiff reported that she had gone to see her daughter graduate and she had a good time.  (R. 290.)  Plaintiff also stated that she planned to move to Washington in the near future.  (R. 290.)  Dr. Puvalai discontinued Plaintiff's use of Vistaril and prescribed Klonopin to treat Plaintiff's anxiety.  (R. 290.)  In October 2004, Plaintiff reported feeling anxious and having panic attacks.  (R. 288.)  Dr. Puvalai recommended that Plaintiff cease using Depakote and Topamax and begin taking Trileptal.  (R. 288.)  In February 2005, Plaintiff reported that she was anxious and depressed.  (R. 286.)  Plaintiff stated that her medications were not helping her, so Dr. Puvalai suggested that she take Risperdal.  (R. 286.) He noted that Plaintiff had panic disorder *with* agoraphobia.  (R. 286.)

During the September 2005 hearing, Plaintiff, Plaintiff's case manager, Vickie Henderson, and a vocational expert (hereinafter "VE"), Bob Hammond, testified. Plaintiff stated that the last time she was employed was in November 2002 at the United States Postal Service.  (R. 337-38.)  Plaintiff also said that she attempted to commit suicide twice, once in 1999 and once in 2000.  (R. 341-42.)  Plaintiff reported that the side effects from her medication include weight gain and drowsiness.  (R. 343-44.)  Plaintiff then stated she has been

diagnosed with agoraphobia with anxiety disorder, bipolar disorder, and OCD. (R. 344.) She said her OCD causes her to be "very picky about certain things" and "do things over and over again." (R. 345.) Plaintiff stated that her agoraphobia renders her unable to leave the house. (R. 345.) She testified that it began in September of 2002 or 2003 and has continued up to the time of the hearing. (R. 345.) Plaintiff also clarified that she traveled to the State of Washington to visit her daughter, and not Washington D.C., as reported earlier in reports by Dr. Puvalai. (R. 347.)

The VE, Bob Hammond, also testified at the hearing. The ALJ asked the VE hypothetical questions about the ability of a person with Plaintiff's characteristics to perform work in the national economy. The hypothetical included: "A younger individual with a high school equivalent education, and the same past relevant work as the claimant, who has the residual functional capacity to lift up to 20 pounds occasionally, up to ten pounds frequently. To stand or walk up to six hours out of an eight-hour day with normal breaks, to sit up to six hours out of an eight-hour day with normal breaks. It does not require more than simple, routine tasks. It does not require constant interaction with coworkers, including supervisors or the general public." (R. 370.) The VE opined that an individual with these characteristics would be unable to perform Plaintiff's past work. However, the VE testified that the hypothetical individual could perform other jobs that existed in the national economy, including laundry worker, sorter, or punch board assembler. (R. 371.) The ALJ then asked the VE if his testimony was "consistent with the information in the Dictionary of Occupational Titles," and the VE testified that it was. (R. 371-72.)

In November 2005, the ALJ denied Plaintiff's application for benefits and in April 2006, Plaintiff filed a complaint against Defendant in this Court, seeking judicial review of the final decision by the Regional Commissioner denying benefits.

After the hearing and decision by the ALJ, Plaintiff submitted new evidence consisting of a January 2006 letter from case manager Lynn Schollenbruch and a January 2006 follow-up psychiatric note from Dr. Melvin Seglin. (R. 328-29.) The letter from Lynn Schollenbruch

indicated that Plaintiff still suffers from bipolar disorder, agoraphobia, and OCD.  (R. 328.)  The follow-up note from Dr. Seglin stated that Plaintiff was agoraphobic and had OCD and she was "very depressed because she was rejected by Social Security for eligibility of her disability." (R. 329.)

In March 2004, the Appeals Council considered Plaintiff's January 2006 memorandum as well as the additional evidence submitted, and determined that "neither the contentions nor the additional evidence provide a basis for changing the [ALJ's] decision."  (R. 7.)  As a result, the ALJ's decision became the final decision of the Commissioner.

## II.  Standard of Review

In reviewing an ALJ's decision, this Court does not try the case *de novo* or replace the ALJ's finding with the Court's own assessment of the evidence.  *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).  The findings of the Commissioner of the Social Security as to any fact, if supported by substantial evidence, are conclusive.  42 U.S.C. § 405(g).  Thus, the question before the Court is not whether a plaintiff is, in fact, disabled, but whether the evidence substantially supports the ALJ's findings.  *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether a plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits.  *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996).  The Court gives considerable deference to the ALJ's credibility determination and will not overturn it unless the plaintiff can show that it is patently wrong.  *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989); *Urban v. Sullivan*, 799 F.Supp. 908, 912 (C.D. Ill. 1992).

## III.  Analysis

Plaintiff argues that the ALJ erred by (1) rejecting the opinions of treating physician Dr. Barnett and treating psychiatrist Dr. Reddy; and (2) failing to adequately establish that Plaintiff can perform other work available in the national economy.  Plaintiff also argues that the

Appeals Council erred by (3) failing to give adequate weight to new evidence submitted by Plaintiff after the ALJ's decision.

### A.  The ALJ's Decision

To be entitled to disability benefits under the SSA, a claimant must show that she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of at least twelve months.  42 U.S.C. § 416(I)(A).  The ALJ must make a factual determination that a severe impairment has rendered the claimant unable to do her previous work or any other substantial gainful activity that exists in significant numbers in the national economy.  20 C.F.R. §§ 404.1505(a), 416.966(a) (2007); *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980).

Social Security regulations outline a five-step inquiry for the ALJ to follow in determining whether a claimant is disabled.  20 C.F.R. § 416.920(a)-(f).  The Commissioner must determine in sequence:  (1) whether the claimant is currently employed (or was during the relevant period); (2) whether he had a severe impairment; (3) whether his impairment met or equaled one listed by the Commissioner; (4) whether the claimant could have performed his past work; and (5) whether the claimant was capable of performing any work in the national economy.  *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).  Once the claimant has satisfied the first two steps, he will automatically be found disabled if he suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform his past work, the burden shifts to the Commissioner to show that the claimant can perform some other job. *McNeil*, 614 F.2d at 145.

The ALJ's November 2005 decision follows this five-step analysis.  At the first step, the ALJ found that Plaintiff had not been engaged in substantial gainful activity during the relevant time period.  At the second step, the ALJ determined that Plaintiff had a history of impairments that resulted in her being severely impaired.  In the third step, the ALJ determined that Plaintiff's condition did not meet or medically equal any of the impairments listed in the regulations.  At

step four, the ALJ found that Plaintiff was unable to perform her past relevant work as a
waitress, nursery school attendant, data entry clerk, payroll clerk, or food service manager.  At
step five, the ALJ found that Plaintiff had the residual functional capacity (hereinafter "RFC") to
perform other jobs that existed in significant numbers in the national economy.  As a result, the
ALJ found that Plaintiff was not eligible for SSI or DIB.

### B.  The Weight Given to the Treating Doctors' Opinions

Plaintiff first argues that the ALJ wrongly discounted the weight he gave to the medical
opinions of Plaintiff's treating physician and psychiatrist.  Plaintiff claims that the ALJ implicitly
rejected the opinion of the treating doctors because the ALJ concluded that Plaintiff retained the
RFC for light work "that does not require more than simple, routine tasks or constant interaction
with co-workers or the general public."  (#11, p. 13.)  The Court disagrees, for the reasons
described below.

SSR 96-2p sets forth when the ALJ must give medical opinion evidence controlling
weight.  "The opinion of a treating physician is given controlling weight if it is well supported by
medically acceptable clinical or laboratory diagnostic testing and not inconsistent with other
substantial evidence in the record." *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 818 (N.D. Ill.
2006).  If the treating physician's opinion is inconsistent with the rest of the evidence, then it is
not entitled to controlling weight, and the ALJ must weigh all the evidence using the factors
applied to medical opinion evidence.  *Id.*  Generally more weight is given to the opinion of a
source who has examined the subject as opposed to the opinion of a source who has not
examined the subject.  SSR 96-5p.  SSR 96-5p sets forth the factors used in deciding the weight
to give medical opinions, including:  (1) the length of the treatment relationship and frequency of
visits; (2) the nature and extent of the relationship, including the treatment given and extent of
any examinations; (3) whether the opinion is supported by medical testing and the explanation
given by the physician; (4) consistency with the rest of the record; (5) the physician's
specialization; and (6) any other factors.  20 C.F.R. § 404.1527(d)(2)-(6) (2007).  And lastly, the
ALJ must articulate her reasons for the weight she gave a treating physician's opinion.
SSR 96-2p; SSR 96-5p.

### 1. Dr. Barnett

Plaintiff argues that the ALJ erred by failing to give controlling weight to Dr. Barnett's opinions that she was unable to work, she was unable to "sustain concentration or social interaction necessary for work related activities" (R. 21) because of her bipolar disorder, and she had agoraphobia.

The ALJ stated that he did not afford controlling weight to Dr. Barnett's opinions because (1) Dr. Barnett is a family doctor rather than a psychologist, (2) Dr. Barnett based his opinions on Plaintiff's subjective reports and the opinions are not supported by any objective testing or clinical findings; and (3) portions of Dr. Barnett's opinions are inconsistent with other substantial evidence in the record. (R. 18-19.)

As to the ALJ's first rationale for not giving controlling weight to Dr. Barnett's opinion, Plaintiff correctly states that the fact that Dr. Barnett is a family physician and not a psychiatrist does not alone provide dispositive grounds for rejecting his opinion. (#11, p. 14.) Instead, as stated above, the physician's specialization is a *factor* used in deciding the weight that medical opinions are given. 20 C.F.R. § 404.1527(d)(5) (2007). Although ALJs "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist," this fact, standing alone, does not justify giving an opinion no weight. *Id.* Accordingly, the ALJ may use the fact that Dr. Barnett is not a psychiatrist as a factor to decide what weight his opinion should receive.

The ALJ's second reason is that Dr. Barnett's opinions were based on Plaintiff's subjective complaints and were not supported by objective testing or clinical findings. In response, Plaintiff contends that Dr. Barnett's progress notes refer to objective observations that satisfy the requirement that the opinion be supported by "objective testing or clinical findings." Specifically, Plaintiff refers to Dr. Barnett's findings of fatigue, frustration, depression, difficulty sleeping, frequent crying, "slight rocking posture," feeling panicky about leaving her home, increased irritability, agitation, and anxiety. Many of these behaviors are based on Plaintiff's subjective complaints, but some could have been based on the doctor's observations.

11

There is some precedent to support the ALJ's second reason for discounting Dr. Barnett's opinion.  An ALJ may discount the opinions of treating doctors if the opinion was simply a "recitation of a claimant's subjective complaints."  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *accord White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005); *Jones v. Barnhart*, 269 F. Supp. 2d 1013, 1020 (N.D. Ill. 2003).  These cases discounted the treating doctor's opinion when those opinions were based on a plaintiff's subjective complaints because the opinions were inconsistent with substantial evidence in the record and objective observations. *White*, 415 F.3d at 659; *Rice*, 384 F.2d at 370-71; *Jones*, 269 F. Supp. 2d at 1020.  That leads us to the ALJ's third reason, that the treating physician's opinion was inconsistent with other evidence in the record.

In the instant case, the record contains evidence that is inconsistent with some of Dr. Barnett's opinions.  For example, Dr. Barnett opined that Plaintiff suffered from agoraphobia.  (R. 19.)  However, Dr. Turl doubted that Plaintiff was agoraphobic because "she is able to leave her house for those things which are in her best interests, or which she wants to do."  (R. 188.)  In fact, Plaintiff has been able to leave her house for various activities, including a ten-day trip to Washington, doctor visits, and regular trips to the bank.  (R. 347, 353.)  This objective evidence supports the ALJ's statement that evidence in the record was inconsistent with Dr. Barnett's opinions.

If an ALJ concludes that the treating physician's opinion is inconsistent with other evidence, he must explain the inconsistency.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).  As discussed above, the ALJ has adequately done that.  Accordingly, the Court concludes that the ALJ did not err by failing to give Dr. Barnett's medical opinion controlling weight.

## 2.  Dr. Reddy

Plaintiff also argues that the ALJ erred by failing to give controlling weight to the opinions of Plaintiff's psychiatrist, Dr. Reddy.  In his June 2003 report, Dr. Reddy opined that Plaintiff was "not capable of work-related activities as her psychiatric symptoms were persistent

2:06-cv-02074-DGB   # 16   Page 13 of 17

and recurrent despite her prescribed medications." (R. 235-37.) He described Plaintiff as exhibiting a great deal of motor activity, rarely leaving her home, having no friends, and not interacting with neighbors. In addition, the doctor reported that Plaintiff needed constant financial and emotional assistance from family members.

The ALJ stated that he did not afford controlling weight to Dr. Reddy's opinion because (1) Dr. Reddy had only seen Plaintiff six times; (2) the report was internally inconsistent; and (3) the opinion was inconsistent with the record as a whole. (R. 19.)

As a preliminary matter, it is unclear how many times Plaintiff consulted Dr. Reddy. The ALJ stated at one point that Dr. Reddy had only seen Plaintiff six times, and elsewhere in his decision acknowledged that Dr. Reddy "had seen the claimant once a week for the past six months." (R. 19.) The record indicates that Dr. Reddy reported he had seen Plaintiff weekly from December 2002 to June 2003. (R. 235.) Thus, to the extent that the ALJ relied on a belief that Plaintiff saw Dr. Reddy only six times, he appears to have made a mistake of fact. Nevertheless, this error alone does not make the ALJ's decision wrong because the ALJ articulated other reasons for declining to give the doctor's opinions controlling weight.

After reviewing Dr. Reddy's report, the Court agrees that it contains some internal inconsistencies. For example, Dr. Reddy states that Plaintiff "doesn't have any friends to associate with," but then states that the Plaintiff "babysits for her friend on a daily basis." (R. 235-36.) Also, although Dr. Reddy states that Plaintiff is agoraphobic, he mentions that she can leave the house for medical appointments. (R. 235-37.) In addition, the Court agrees that the opinions in the report are inconsistent with the record as a whole. Dr. Reddy states that Plaintiff is agoraphobic (R. 237) but, as stated above, this is inconsistent with the opinion of Dr. Turl, who doubted that Plaintiff was agoraphobic because "she is able to leave her house for those things which are in her best interests, or which she wants to do." (R. 188.) Plaintiff testified that she leaves her house for various activities, including a trip to Washington, D.C., doctor visits, and trips to the bank. (R. 347, 353.) Dr. Reddy also opined that Plaintiff "can't

leave her home for any long period of time." (R. 236.) However, some time after he made this statement, Plaintiff spent at least ten days away from home when she visited her daughter.

The ALJ based his decision regarding Dr. Reddy's opinions on findings of internal inconsistency and inconsistency with other evidence in the record. The Court is satisfied that the ALJ sufficiently explained his reasoning and appropriately weighed the evidence in the record. Accordingly, the Court cannot conclude that the ALJ erred by refusing to given Dr. Reddy's medical opinions controlling weight.

### C. Hypothetical Questions Posed to the VE

Plaintiff next contends that the ALJ erred by failing to include all of Plaintiff's limitations when posing hypothetical questions to the VE.

In response to Plaintiff's argument, Defendant contends that "[t]he ALJ is not required to phrase his hypothetical question or his assessment of an individual's [RFC] in terms that perfectly mirror his Step Three assessment under the Listing of Impairments, or the manner in which state agency physicians completed the PRTF." (#12, p.11.)

A hypothetical question to the VE typically must include all limitations supported by medical evidence in the record so that the VE can understand the full extent of the applicant's disability. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). This prevents a VE from declaring that an applicant is capable of performing work in the national economy that he cannot truly perform. *Id.*

Plaintiff contends that the ALJ failed to include that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. The ALJ expressly noted in his decision that the Plaintiff "has moderate difficulties in maintaining concentration, persistence or pace." (R. 21.) The ALJ's finding was based on state agency psychologist Dr. Brister's statement that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. (R. 249.) However, the ALJ curiously left out this limitation when posing hypothetical questions to the VE. In

*Kasarsky v. Barnhart*, the court remanded the case when the RFC failed to include that the claimant had "frequent deficiencies of concentration, persistence, or pace," a finding made previously by the ALJ in his own decision. *Kasarsky v. Barnhart,* 335 F.3d 539, 544 (7th Cir. 2003). While the court in *Kasarsky* noted that there may be an explanation for the omission, the court stated that "[t]he ALJ's failure to incorporate the latter kind of limitation, fully supported by this record, in the hypotheticals he posed to the vocational expert requires us to remand this case for further proceedings." *Id. See also Sayles v. Barnhart*, 2004 WL 3008739, *22 (N.D. Ill. Dec. 27, 2004) (unreported) (holding that remand is required because "the ALJ failed to incorporate Plaintiff's mental impairment related to his moderate difficulties in maintaining concentration, persistence or pace into the hypothetical question (and its variations) she posed to the VE").

Additionally, the ALJ stated that "based on the record as a whole, including new and material evidence," his RFC determination was "slightly different than that which was determined by the state agency." (R. 23.) However, the ALJ never identified the evidence in the record that warranted a different RFC. The ALJ "must 'build an accurate and logical bridge from the evidence to [his] conclusion.'" *Steele*, 290 F.3d at 942 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Here, he did not do so.

"An ALJ may not simply select and discuss only that evidence which favors his ultimate conclusion." *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000). "Rather, an ALJ's decision must be based upon consideration of all the relevant evidence." *Id.* Accordingly, because the ALJ changed the RFC and omitted Plaintiff's limitations regarding concentration, persistence, and pace from the hypothetical question without explaining why, this Court concludes that remand is necessary for the ALJ to incorporate all of Plaintiff's limitations in the hypothetical questions to the VE and explain his reasoning.

The Court additionally notes that Plaintiff argues that the VE's testimony was not consistent with the Dictionary of Occupational Titles (hereinafter "DOT"). (#11, p. 18.) While the Court recognizes that the ALJ is obligated to "[i]dentify and obtain a reasonable explanation

for any conflicts between occupational evidence provided by VEs . . . and information in the . . . DOT"(SSR 00-4p), we need not address this issue at this point because the order to remand for a fully developed hypothetical may alter the VE's testimony, rendering any analysis herein irrelevant.  However, upon remand, and consistent with the above instructions to fully develop the hypothetical questions to the VE, the Court instructs the ALJ to appropriately reconcile any conflicts between the VE's testimony and the DOT consistent with the instructions in SSR 00-4p.

### D.  New Evidence Submitted to the Appeals Council

Plaintiff's final contention is that the Appeals Council erred by determining that Plaintiff's new evidence did not provide a basis for changing the ALJ's decision.  The new evidence consisted of a January 2006 letter from case manager Lynn Schollenbruch and a January 2006 follow-up psychiatric note from Dr. Melvin Seglin.  (R. 328-29.)  Plaintiff contends that "[i]n denying review, the Appeals Council did not even reference this new evidence."  (#11, p. 26.)  As a preliminary matter, the Court notes that the Appeals Council did directly consider the additional evidence submitted, stating that "neither the contentions nor the additional evidence provide[d] a basis for changing the [ALJ's] decision."  (R. 7.)

In response to Plaintiff's argument, Defendant asserts that "[t]he evidence Plaintiff submitted to the Appeals Council was not material, as it did not pertain to the period of time prior to the ALJ's November 2005 decision."  (#12, p. 12.)  "Remand for consideration of additional evidence is appropriate only upon a showing that the evidence is new and material to the claimant's condition during the relevant time period encompassed by the disability application under review, and there is good cause for not introducing the evidence during the administrative proceedings."  *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990) (quoting *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989)).  Both pieces of new evidence address Plaintiff's condition *after* the November 2005 hearing occurred.  The letter from Lynn Schollenbruch "indicat[ed] that [Plaintiff] *continued* to manifest extensive manic and depressive episodes . . . ."  (#11, p. 27; R. 328) (emphasis added).  Dr. Seglin's follow-up note stated that Plaintiff appeared very depressed *after* she was denied Social Security disability

16

benefits.  (R. 329.)  Because the new evidence referred to Plaintiff's condition after November 2005, it is not "material to the claimant's condition during the relevant time period encompassed by the disability application under review."  *Kapusta*, 900 F.2d at 97.  As the court in *Kapusta* determined, "reports postdating the hearing speak only to [claimant's] current condition, not to his condition at the time his application was under consideration by the Social Security Administration."  *See also Schmidt v. Barnhart*, 395 F.3d 737, 743 (7th Cir. 2005) (holding that new evidence did not meet criteria for "new and material" because "[n]one of the proffered evidence speaks to [claimant's] condition as it existed at or prior to the time of the administrative hearing").  Accordingly, the Appeals Council did not err by refusing to review the ALJ's decision based on the new evidence submitted by Plaintiff.

## IV.  Summary

For the reasons set forth above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment **(#10)**.  Furthermore, the Court orders that the decision be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g),[2] for further consideration consistent with this order.

ENTER this 27th day of August, 2007.

_____ s/ DAVID G. BERNTHAL _____
U.S. MAGISTRATE JUDGE

_____

[2]Under 42 U.S.C. § 405(g), Sentence Four, "[t]he court shall have power to enter, upon pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing."